# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **ELIZABETH E. LYALL,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:13cv00031 |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | **MEMORANDUM OPINION** |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | |
| Defendant | ) | BY: PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Elizabeth E. Lyall, ("Lyall"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2011). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by transfer based on consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Oral argument has not been requested; therefore, the matter is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may

-1-

be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Lyall protectively filed an application[1] for DIB[2] on April 3, 2009, alleging disability as of April 2, 2009, due to depression, anxiety, panic attacks, acid reflux, thyroid problems, restless leg syndrome, arthritis in the left hand and insomnia.[3] (R. at 203-04, 224, 232, 247.) The claim was denied initially and on reconsideration. (R. at 126-28, 132-34, 137-40, 142-44.) Lyall then requested a hearing before an administrative law judge, ("ALJ"), (R. at 145.) The hearing was held on October 26, 2011, at which Lyall was represented by counsel. (R. at 33-56.)

By decision dated November 23, 2011, the ALJ denied Lyall's claim. (R. at 11-25.) The ALJ found that Lyall met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2010. (R. at 14.) The ALJ also

---

[1] Lyall filed a prior application for DIB alleging disability as of October 24, 2005. (R. at 11, 60.) By decision dated April 1, 2009, the claim was denied. (R. at 11, 60-71.) An appeal was not filed with the Appeals Council. (R. at 11.)

[2] Lyall also filed an application for supplemental security income, ("SSI"), on April 22, 2009. (R. at 210-12.) However, she was found not eligible to file for SSI because of her family income. (R. at 118-21.)

[3] Because Lyall filed a prior application for DIB, which was denied by decision dated April 1, 2009, this prior decision is res judicata. That being the case, the question before the court is whether Lyall was disabled at any time between April 2, 2009, the date following the ALJ's prior denial, and December 31, 2010, her date last insured. Any facts included in this Memorandum Opinion not directly related to this time period are included for clarity of the record.

Case 2:13-cv-00031-PMS   Document 16   Filed 11/13/14   Page 2 of 14   Pageid#: 996

found that Lyall had not engaged in substantial gainful activity during the period from her alleged onset date of April 2, 2009, through her date last insured of December 31, 2010. (R. at 14.) The ALJ found that the medical evidence established that, through the date last insured, Lyall suffered from severe impairments, namely obesity, degenerative disc disease; status-post left wrist fracture; obstructive sleep apnea; anxiety; depression; hypothyroidism; and restless leg syndrome, but she found that Lyall did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 14-16.) The ALJ found that Lyall had the residual functional capacity to perform simple, routine, repetitive, light work,[4] which did not require more than occasional climbing of ramps and stairs, balancing, kneeling, stooping, crawling and crouching, that did not require exposures to hazardous machinery, unprotected heights, climbing of ladders, ropes or scaffolds, vibrating surfaces or operation of a motor vehicle and that allowed only superficial interaction with co-workers and supervisors and no interaction with the general public. (R. at 16.) The ALJ found that Lyall was unable to perform her past relevant work as a personal care attendant, a sewing machine operator or a waitress. (R. at 23.) Based on Lyall's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ also found that jobs existed in significant numbers in the national economy that Lyall could perform, including jobs as an assembler, a packer and an inspector/tester/sorter. (R. at 23-24.) Thus, the ALJ found that Lyall was not under a disability as defined under the Act from April 2, 2009, the alleged onset date, through December 31,

---

[4] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2013).

2010, the date last insured, and was not eligible for benefits. (R. at 24.) *See* 20 C.F.R. § 404.1520(g) (2013).

After the ALJ issued her decision, Lyall pursued her administrative appeals, but the Appeals Council denied her request for review. (R. at 1-5.) Lyall then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2013). The case is before this court on Lyall's motion for summary judgment filed January 8, 2014, and the Commissioner's motion for summary judgment filed February 10, 2014.

## *II. Facts*

Lyall was born in 1967, (R. at 38, 203), which classifies her as a "younger person" under 20 C.F.R. § 404.1563(c). She has a high school education, some general college course work and vocational education as a certified nurse's assistant, ("CNA"). (R. at 38, 230.) Lyall has past relevant work experience as a personal care attendant, a seamstress and a waitress. (R. at 38, 225.) She stated that she had not sought emergency treatment or hospitalization for her symptoms of depression. (R. at 42-43.)

John Newman, a vocational expert, also was present and testified at Lyall's hearing. (R. at 49-55.) Newman was asked to consider a hypothetical individual who could perform simple, routine, repetitive, light work which did not require more than occasional climbing of ramps and stairs, balancing, kneeling, stooping, crawling and crouching, that did not require exposures to hazardous machinery, unprotected heights, climbing of ladders, ropes or scaffolds, working on vibrating services or operation of a motor vehicle and that allowed only superficial

Case 2:13-cv-00031-PMS   Document 16   Filed 11/13/14   Page 4 of 14   Pageid#: 998

interaction with co-workers and supervisors and no interaction with the general public. (R. at 51.) Newman stated that the individual would be unable to perform Lyall's past work. (R. at 51.) He stated that such an individual could perform other work that existed in significant numbers, including jobs as an assembler, a packer and an inspector/tester/sorter. (R. at 51-52.) Newman stated that there would be no jobs available that such an individual could perform should she be off task 30 to 40 percent of the workday. (R. at 52-53.) He also stated that there would be no jobs available should the same individual have an unsatisfactory ability to relate to co-workers, to interact with supervisors, to deal with work stresses, to maintain attention and concentration and to demonstrate reliability. (R. at 53-54.)

In rendering her decision, the ALJ reviewed medical records from Howard S. Leizer, Ph.D., a state agency psychologist; Julie Jennings, Ph.D., a state agency psychologist; Dr. Uzma Ehtesham, M.D., a psychiatrist; Susan G. Myers, L.C.S.W., a licensed clinical social worker; and Vada Rose, F.N.P., a family nurse practitioner.

On February 10, 2009, Lyall reported to Vada Rose, F.N.P., a family nurse practitioner, that Ativan was helping her "a lot." (R. at 705.) However, she stated that she was still sad. (R. at 705.) She reported that she recently cried so much that her husband finally took a day off of work to stay with her. (R. at 705.) On April 27, 2009, Lyall reported to Rose that she was crying a lot and that she did not feel that Lexapro was helping. (R. at 703-04.) Lyall's medication was changed to Cymbalta. (R. at 703.) On May 18, 2009, Lyall reported to Rose that Cymbalta was helping her depression, and she stated that she felt a lot better. (R. at 701-02.) In fact, Lyall described feeling better than she had felt in a long time. (R. at 701.) On

June 17, 2009, Lyall reported that she was feeling worse on Cymbalta. (R. at 772.) She reported that she was crying more and thought about how her family would be if she was not around anymore. (R. at 772.) She reported that she was not suicidal. (R. at 772.) On July 29, 2009, Lyall reported that her depression had improved. (R. at 771.) Lyall was not crying as much, was not feeling suicidal and was enjoying her family more. (R. at 771.) On October 29, 2009, Lyall complained of anxiety and excessive worrying. (R. at 770.) Rose noted that Lyall had a lot of depression and anxiety. (R. at 770.) Lyall denied suicidal ideation. (R. at 770.) On May 13, 2010, Lyall reported having a bad winter and not going out much, which she believed made her depression worse. (R. at 822.) She reported feeling a difference in her depression since she started taking Abilify. (R. at 822.) Lyall was next seen by Rose on March 1, 2011. (R. at 904-06.) Lyall reported that her medication had "really worked well." (R. at 904.) She stated that she was very pleased with the way she was able to function. (R. at 904.) Lyall reported getting out more and going with her family and that her crying spells had decreased. (R. at 904.)

On April 14, 2009, Lyall reported to Susan G. Myers, L.C.S.W., a licensed clinical social worker, that all she wanted to do was sit and cry. (R. at 699.) She described feeling sad all the time and stated that her grandmother was sick. (R. at 699.) On examination, Lyall's mood was depressed, and her affect was anxious, but her orientation and thought process were intact, and she had no paranoia or delusions. (R. at 699.) Myers noted that Lyall's judgment and insight were limited. (R. at 699.) Myers increased Lyall's dosage of Ativan.[5] (R. at 699.) Myers diagnosed recurrent, severe major depressive disorder, without psychotic behavior

---

[5] As a licensed clinical social worker, Myers should have no authority to prescribe medication, but her note documents an order to increase Lyall's dosage of Ativan.

and panic disorder without agoraphobia. (R. at 699.) On June 8, 2009, Lyall reported that she did not like being out and could not handle being around crowds. (R. at 740.) On examination, Lyall's mood was depressed, and her affect was anxious, but her orientation and thought process were intact, and she had no paranoia or delusions. (R. at 740.) On September 15, 2009, Lyall reported having no energy and just wanting to sleep. (R. at 739.) Lyall reported that she had not left the house for three weeks. (R. at 739.) Lyall's mood was depressed, her affect was anxious, and her thought process was intact. (R. at 739.) She had no paranoia or delusions, and her judgment and insight were limited. (R. at 739.)

On August 19, 2009, Howard S. Leizer, Ph.D., a state agency psychologist, reported that Lyall suffered from an affective disorder, mental retardation and anxiety-related disorder. (R. at 80.) He found that Lyall had mild restriction on her ability to perform activities of daily living and in maintaining social functioning. (R. at 80.) Leizer found that Lyall had moderate difficulties in maintaining concentration, persistence or pace and that she had not experienced repeated episodes of decompensation of extended duration. (R. at 80.)

Leizer opined that Lyall had moderate limitations in her ability to understand, remember and carry out detailed instructions, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. at 84.) Leizer noted that Lyall had sustained concentration and persistence limitations. (R. at 84.) He noted that Lyall's allegations were partially credible. (R. at 84.) Leizer opined that

Lyall's limitations did not prevent her from engaging in repetitive, unskilled, nonstressful work. (R. at 85.)

On March 18, 2010, Lyall began treatment with Dr. Uzma Ehtesham, M.D., a psychiatrist. (R. at 802-07.) Lyall complained of excessive worry, fatigue, irritability, restlessness, sadness, hopelessness, paranoia and visual hallucinations. (R. at 802.) In particular, she claimed she saw bugs. (R. at 802.) Her hygiene and grooming were good, and she was dressed casually. (R. at 805.) Lyall maintained good eye contact, and she had an anxious affect. (R. at 805.) Her thought process was goal-oriented, her insight was good, her judgment was intact, and she was alert and oriented. (R. at 805.) Lyall denied suicidal ideation and did not present a threat of violence. (R. at 806.) Dr. Ehtesham diagnosed recurrent, severe major depressive disorder, with psychotic features. (R. at 807.) Dr. Ehtesham assessed Lyall's then-current Global Assessment of Functioning score, ("GAF"),[6] at 60.[7] (R. at 807.) On April 20, 2010, Lyall reported that her depression and mood swings had improved. (R. at 808.)

On May 21, 2010, Dr. Ehtesham completed a mental assessment indicating that Lyall had a seriously limited, but not precluded, ability to no useful ability to make occupational, performance and personal/social adjustments. (R. at 841-43.) Dr. Ehtesham opined that Lyall was permanently disabled. (R. at 843.) On June 3, 2010, Lyall stated that her mood swings had decreased, but she was more irritable.

---

[6] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[7] A GAF score of 51-60 indicates that the individual has moderate symptoms or moderate difficulty in social, occupational or school functioning. *See* DSM-IV at 32.

(R. at 882.) She had no attention symptoms, fair hygiene and made intermittent eye contact. (R. at 882.) On June 30, 2010, Lyall reported that her depression had increased after being in an accident in May. (R. at 880.) Lyall was agitated and paranoid, made intermittent eye contact, displayed spontaneous speech, had an anxious affect and did not have any homicidal ideation. (R. at 880.) Dr. Ehtesham increased Lyall's dosages of Zoloft and Ability. (R. at 880-81.) Dr. Ehtesham concluded that Lyall's anxiety had decreased, and she did not present an imminent threat for suicide or homicide. (R. at 880.) On August 17, 2010, Lyall reported that her anger was less severe, but her depression had increased. (R. at 884.) On September 15, 2010, Lyall's anger was less severe, her mood swings were lessening, and she was not as tired. (R. at 886.) Lyall made intermittent eye contact, was anxious and displayed fair insight and intact judgment. (R. at 886.) On October 19, 2010, Lyall complained of still being depressed, but stated that her anger was less severe. (R. at 888.) On December 1, 2010, Lyall reported that she was crying a lot, but stated that her depression had decreased. (R. at 890.) Lyall was paranoid, but there was no evidence of mania, and she denied homicidal and suicidal ideation. (R. at 890-91.)

On January 11, 2011, Lyall continued to complain of depression. (R. at 892.) However, in May, July and August 2011, Lyall reported that her depression and mood swings had decreased. (R. at 896, 898, 911.) On August 5, 2011, Dr. Ehtesham reported that Lyall was stable, and her depression had improved. (R. at 911.) Dr. Ehtesham completed a mental assessment on September 6, 2011, stating that Lyall had a seriously limited to no useful ability to make occupational, performance and personal/social adjustments. (R. at 913-15.) On October 6, 2011, Dr. Ehtesham opined that Lyall met or equaled the listings for affective disorders

and anxiety-related disorders found at § 12.04 and § 12.06, respectively. (R. at 918-21.)

Dr. Ehtesham assessed Lyall's anxiety and depression on a scale of one to ten and consistently concluded that her anxiety and depression ranked between three and five. (R. at 808, 880, 882, 884, 886, 888, 890, 892, 896, 898, 911.) Mental status examinations generally showed that Lyall's mood appeared depressed or anxious, but she had fair insight, goal-oriented thought processes and no hallucinations or suicidal or homicidal ideation. (R. at 808-09, 880, 882, 884, 886, 888, 890, 892, 896, 898, 911.)

On April 15, 2010, Julie Jennings, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Lyall had a mild restriction on her ability to perform activities of daily living and in maintaining social functioning. (R. at 100-01.) She found that Lyall had moderate difficulties in maintaining concentration, persistence or pace and that she had not experienced repeated episodes of decompensation for extended duration. (R. at 101.)

Jennings opined that Lyall had moderate limitations in her ability to understand, remember and carry out detailed instructions, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. at 105.) Jennings noted that Lyall had sustained concentration and persistence limitations. (R. at 105.) She noted that Lyall's allegations were partially credible. (R. at 105.) Jennings opined

that Lyall's limitations did not prevent her from engaging in repetitive, unskilled, nonstressful work. (R. at 106.)

## *III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2013); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2013).

Lyall argues that the ALJ erred by failing to adhere to the treating physician rule to give controlling weight to the opinions of Dr. Ehtesham. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-6.) Lyall does not challenge the ALJ's finding as to her physical impairments or her physical residual functional capacity.

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must

consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(c), if she sufficiently explains her rationale and if the record supports her findings.

Lyall argues that the ALJ erred by failing to adhere to the treating physician rule and give controlling weight to the opinions of Dr. Ehtesham. (Plaintiff's Brief at 5-6.) After a review of the evidence of record, I find Lyall's argument unpersuasive. The ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof of disability cases. *See McLain v. Schweiker*, 715 F.2d 866, 869 (4th Cir. 1983). The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. § 404.1527(c)(2) (2013). However, "[c]ircuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per

curiam)). In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

Based on my review of the record, I find that substantial evidence exists to support the ALJ's decision to not give controlling weight to the opinions of Dr. Ehtesham. In October 2011, Dr. Ehtesham opined that Lyall's mental impairments satisfied the requirements of Listings 12.04 and 12.06. (R. at 918-21.) Dr. Ehtesham noted that Lyall had marked restriction in activities of daily living and in maintaining concentration, persistence or pace. (R. at 919.) Dr. Ehtesham further indicated that Lyall had repeated episodes of decompensation of extended duration and had a history of one or more years of inability to function outside a highly supportive living arrangement. (R. at 919.) The ALJ noted that this assessment was not supported because there were no episodes of decompensation noted in the record and that Lyall had not required psychiatric hospitalization. (R. at 22.) The ALJ further noted that Dr. Ehtesham's opinion was internally inconsistent with her treatment notes showing improvement in Lyall's symptoms. (R. at 22.)

Dr. Ehtesham assessed Lyall's anxiety and depression on a scale of one to ten and consistently concluded that her anxiety and depression ranked between three and five. (R. at 808, 880, 882, 884, 886, 888, 890, 892, 896, 898, 911.) Mental status examinations generally showed that Lyall's mood appeared depressed or anxious, but she had fair insight, goal-oriented thought processes and no hallucinations or suicidal or homicidal ideation. (R. at 808-09, 880, 882, 884, 886, 888, 890, 892, 896, 898, 911.) Lyall reported to Rose in May 2010 that her symptoms of depression had improved since taking Abilify. (R. at 822.) In March

2011, she reported that her medication had "really worked well" and that she was very pleased with the way that she was able to function. (R. at 904.) She reported getting out more and going with her family and that her crying spells had decreased. (R. at 904.) In fact, Lyall repeatedly reported to Dr. Ehtesham that her anger was less severe, her mood swings were lessening and that her depression had decreased. (R. at 880, 882, 886, 888, 890, 896, 898, 911.) On August 5, 2011, Dr. Ehtesham reported that Lyall was stable, and her depression had improved. (R. at 911.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). Instead, the ALJ relied upon the opinions of the state agency psychologists, who found that Lyall was capable of meeting the basic demands of repetitive, competitive, unskilled, nonstressful work on a sustained basis despite her mental impairments. (R. at 22, 85, 106.)

Based on this, I find that substantial evidence supports the weighing of the psychological evidence by the ALJ. That being so, I further find that substantial evidence supports the ALJ's finding as to Lyall's mental residual functional capacity and her finding that Lyall was not disabled. An appropriate order and judgment will be entered.

ENTERED: November 13, 2014.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE